**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No.: 1:15CR-069** |
| **Plaintiff,** | |
| **v.** | |
| **JASON GMOSER** | **DEFENDANT'S SENTENCING MEMORANDUM** |
| **Defendant** | |

## INTRO

Now comes the Defendant, Jason Gmoser, by and through counsel, and hereby presents the following Sentencing Memorandum for the Court's consideration. It is not submitted as argument, but more to present his background. It is our hope that the court will impose the recommended sentence by the parties.

## DEFENDANT'S HISTORY

Jason Gmoser, the Defendant, was born on September 24, 1979, in Cincinnati, Ohio, the biological son of Angela Price, also known as Angela Miller. The identity of Jason's biological father is unknown. Jason has also never had a relationship with the biological mother. Angela Price has had struggles with substance abuse and numerous periods of incarceration throughout her life and is now presumed deceased. At the time of her presumed death, there were several open warrants for her arrest. Jason was adopted by Olga (nee Watkins) and Michael Gmoser when the defendant was approximately seven months old, but he had reportedly been abused and neglected before the Gmoser's received

him, including receiving cigarette burns all over his body. Jason's adoptive father, age 75, is the elected County Prosecutor in Butler County, Ohio. His adoptive mother retired from the practice of law in approximately 2004, and passed away on May 10, 2014, due to cancer. Judge Bruce stated at his original sentencing hearing that Jason had won the "adoption lottery," but it was never really that simple for Jason and it was certainly never a fairytale childhood. A great majority of Jason's "issues" stem from the fact that he was never able to appreciate the opportunity he had by being adopted by the Gmoser's.

Following Jason's adoption, he lived for about a year in Oxford, Ohio, before moving with his parents to Hamilton, Ohio. He resided at the same residence until the time of his arrest in this case, except for a period of several months in 1998 when he lived with several friends in Marathon, Florida.

When Jason was an adult, his parents purchased and moved to another home in Hamilton, while letting him remain at the home where he was raised. Currently, the defendant is in the custody of the Boone County, Kentucky Jail. Briefly, Jason was housed by the Bureau of Prisons. During the various stages of this case, Jason has remained incarcerated for what has totaled almost nine years at this point.

Jason is a white male who stands five feet, eight inches tall, and weighs 300 pounds. Jason has struggled with obesity throughout his life. In 2012, he suffered from back pain and received care from his primary care physician, Dr. Dennis Humphreys, and at the Center for Advanced Spine Technologies, Cincinnati, Ohio, where he received epidural injections to alleviate the pain. In early March 2016, he re-injured his back, while reaching for the television set in the DeWitt County Jail, Clinton, Illinois. Jason has suffered from numbness from his lower back to his feet and often suffers from severe pain. During certain periods of

2

his incarceration, Jason has been unable to walk and has had to use a wheelchair.

As a result of his lower back issue, Jason is suffering from both fecal and urinary incontinence. He currently uses absorbent, disposable underwear due to his incontinence. On May 13, 2016, the defendant underwent a partial discectomy and laminectomy between the L3, L4, and L5 vertebrae at Advocate Bromenn Medical Center, Normal, Illinois. Jason continues to have residual effects from the discectomy, many of which could have been rectified. Jason voiced complaints concerning the injury for many months before he received treatment. Upon visiting the doctor, it was determined that many of the issues could have been avoided had he received quicker treatment.

Jason was assaulted at the Livingston County Jail as a result of him being known as a pedophile. Jason suffered a concussion, bruised ribs, some contusions and broken glasses. While none of his injuries were severe, the incident is indicative of Jason being unable to assimilate himself in a group setting and Counsel feels it is a scenario that is destined to repeat itself due to Jason's lack of social skills.

Although it was not sufficient for the jury to find that Gmoser, as a result of as severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts, it is clear from the evidence presented that Gmoser has suffered from a long history of mental illness. At trial, the Court heard from several experts, Dr. Judith Campbell, Dr. Stuart Bassman, and Dr. Bennett Leventhal. While there was no consensus by the doctors on a specific diagnosis, it is clear that there was a consensus that he suffered from a long history of mental illness. This documented history began in 2010 when Gmoser underwent a neuropsychological evaluation by Dr. Major Bradshaw, during his first inpatient psychiatric hospitalization. Dr. Bradshaw indicated that Gmoser was experiencing "excessive

delusional beliefs related to sexual thoughts involving as minor." The discharge summary written by psychiatrist Dr. James Flack indicated a diagnosis of a "psychotic disorder, not otherwise specified, psychotic disorder due to a mental condition with hallucinations, and pervasive developmental disorder, not otherwise specified." Examples of his delusional thought included being responsible for the Times Square Bombing and the BP Oil Spill. (Appendix A). Pursuant to Court order, Dr. Campbell performed a complete forensic psychological evaluation. On 4/20/15. Her report indicated a diagnosis of "a pedophilic disorder, schizoid personality disorder and cannabis use disorder." Dr. Stuart Bassman, a forensic psychologist and a witness for the Defense, indicated in his report a diagnosis of a pervasive developmental disorder not otherwise specified. Dr. Bassman further opined that Gmoser "clearly has a severe mental disease and defect. Specifically, he has a pervasive developmental disorder that has impacted his social development to an extent that he has been and remains unable to function in the adult world psychologically, occupationally, emotionally or socially." (Appendix B) Finally, Dr. Leventhal, a witness for the Government in the Illinois trial, stated that while he was not convinced that the defendant suffered from a diagnosis of Pervasive Developmental Disorder, if he did suffer from Pervasive Developmental Disorder, "he would be at the very high end of the autism spectrum." It is important to note that Dr. Leventhal never actually examined Gmoser. (Appendix C) While the Defense concedes that the jury did not find Gmoser's impairment severe enough to find him not guilty, it is clear that there was ample evidence presented to show that Gmoser suffered from some mental health defect. In an effort to nail down the actual impairment or impairments that Gmoser suffers from, the Defense enlisted Dr. Robert E. Cohen, a clinical neuropsychologist from Longwood, Florida. Dr. Cohen specializes in the evaluation of Autism

Spectrum Disorders in adults. Dr. Cohen had Gmoser engage in a clinical interview, several psychological test measures, subtests from the WAIS-V, tests of constructional praxis, a structured inventory of malingered symptoms, Adaptive Behavioral scales, and the MMPI-2-RF. (Appendix D) Dr. Cohen opines that Gmoser's "severely concrete reasoning, firmly held delusional thoughts, and inability to take on other's perspectives, greatly restrict or block his ability to integrate information presented to him." He goes on to state that this restricts Gmoser "in being able to aid in his own defense or work with counsel in a meaningful manner." "His psychotic perseverative thoughts also render him incapacitated to filter out reality from fantasy." This leads to Cohen stating that Gmoser meets the clinical criteria for Autism Spectrum Disorder, and a separate co-morbid psychotic Disorder, NOS. (Appendix D)

## BASIS FOR A BELOW-GUIDELINES SENTENCE

The Sentencing Guidelines recognize that mental and emotional conditions "may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." USSG § 5H1.3.[1] Given the magnitude of Mr. Gmoser's mental health difficulties, it is a condition that is "present to an unusual degree" and that "distinguish[es] the case from the typical cases covered by the guidelines."

The harder question is whether he would also qualify for a downward departure on the basis of USSG § 5K2.13. That provision requires that "the defendant committed the

---

[1] The current language of the provision reflects a 2010 amendment. *See* USSG App. C, Vol III at 348 (Amendment 739). Prior to the amendment, the provision stated that mental and emotional conditions were "not ordinarily relevant in determining whether a departure is warranted." *See* United States v. Ferguson, 942 F.Supp.2d 1186, 1192 (M.D. Ala. 2013).

offense while suffering from a significantly reduced mental capacity," and that "the significantly reduced mental capacity contributed substantially to the commission of the offense." Then, too, the court may not depart if "the defendant's criminal history indicates a need to incarcerate the defendant to protect the public."

To the extent that Mr. Gmoser' limited intellect and mental illness contributed to the offense, a lesser sentence is justified by the recognition that those who commit offenses due to mental illness or deficits of intellect are less culpable:

> Together, the amendments and policy statements [of the Guidelines] reflect the principle that "punishment should be directly related to the personal culpability of the criminal defendant." Penry v. Lynaugh, 492 U.S. 302, 319, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), abrogated on other grounds, Atkins v. Virginia, 536 U.S. 304, 307, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002). A few "exceptionally" mentally ill defendants may be found incompetent to stand trial or judged not guilty by reason of insanity; however, there also exists a spectrum of mental deficits and diseases that lessen, but do not erase, a person's responsibility for her crimes. See Jennifer S. Bard, Re-Arranging Deck Chairs on the Titanic: Why the Incarceration of Individuals with Serious Mental Illness Violates Public Health, Ethical, and Constitutional Principles and Therefore Cannot Be Made Right by Piecemeal Changes to the Insanity Defense, 5 Hous. J. Health L. & Pol'y 1, 4-5 (2005). "[E]vidence about [a] defendant's background and character is relevant" to the sentencing decision, "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." Penry, 492 U.S. at 319 (quoting California v. Brown, 479 U.S. 538, 545, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987) (O'Connor, J., concurring)). [2]

Even if it cannot be said that Mr. Gmoser' impairments contributed to the offense, the usual rationale for punishment has less meaning when applied to those who are as impaired as Jason:

> In addition, the traditional rationales for punishment have less force when applied to mentally ill and cognitively limited defendants. Cantu, 12 F.3d at

---

[2] United States v. Ferguson, 942 F.Supp.2d 1186, 1192-1193 (M.D. Ala. 2013)

1516; United States v. Poff, 926 F.2d 588, 595 (7th Cir. 1991) (en banc) (Easterbook, J., dissenting), cert. denied, 502 U.S. 827, 112 S. Ct. 96, 116 L. Ed. 2d 67 (1991). "Desert (blameworthiness) loses some bite because those with reduced ability to reason, or to control their impulses, are less deserving of punishment than those who act of viciousness or greed," Cantu, 12 F.3d at 1516; "Deterrence has less value ... because people with reduced capacities are less susceptible to a system of punishment and reward." Id.; see also Bard, Re-Arranging Deck Chairs, 5 Hous. J. Health L. & Pol'y at 12-13. The remaining rationale—incapacitation to protect the public safety—does not justify incarcerating mentally ill, intellectually disabled defendants unless they are violent. Cantu, 12 F.3d at 1516; USSG §5K2.13.[3]

There is a growing recognition, too, that prisons are not a solution in the case of those who are mentally ill, that prisons are not the most effective place for treatment, and that both the defendant and the public are better served by treatment alternatives:

> The amended guidelines also reflect the growing recognition that treating mentally ill criminal defendants rather than imprisoning them better serves both the defendants and society. See, e.g., United States v. Bannister, 786 F. Supp. 2d 617, 656-67 (E.D.N.Y. 2011) (Weinstein, J.); Policy Topics: The Criminalization of People with Mental Illness, National Alliance on Mental Illness, http://www.nami.org (last visited February 18, 2013); W. David Ball, Mentally Ill Prisoners in the California Department of Corrections and Rehabilitation: Strategies for Improving Treatment and Reducing Recivisim, 24 J. Contemp. Health L. & Pol'y 1, 34-37 (2007).  Prison is not an appropriate setting for mentally ill defendants to receive treatment, as such individuals may be more vulnerable to difficult living conditions and abuse from other prisoners. Human Rights Watch, Ill-Equipped: U.S. Prisons and Offenders with Mental Illness 56, 59 (2003). This is because, "[f]or mentally disordered prisoners, danger lurks everywhere":

"They tend to have great difficulty coping with the prison code—either they are intimidated by staff into snitching or they are manipulated by other prisoners into doing things that get them into deep trouble.... [M]ale and female mentally disordered prisoners are disproportionately represented among the victims of rape. Many voluntarily isolate themselves in their cells in order to avoid trouble. Prisoners who are clearly psychotic and chronically disturbed are called 'dings' and 'bugs' by other prisoners, and victimized. Their anti-psychotic medications slow their reaction times, which makes them more vulnerable to 'blind-siding,' an attack from the side or from behind by another prisoner."

---

[3] Id. at 1193

Id. at 56-57 (quoting Terry Kupers, Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It 20 (1999)). Providing comprehensive, effective treatment for those mentally ill defendants whose disorder drives their criminality will more likely protect the public from suffering future crime—and that treatment does not come from incarceration. [4]

The same reasoning that supports a departure in Mr. Gmoser's case would also justify a variance. *See, e.g.,* United States v. Lovato, 798 F.Supp.2d 1257, 1259 (D.N.M. 2011); *Id.* at *21; United States v. Flowers, 2013 WL 2250611, *4 (M.D. Ala. 2013); United States v. Winston, 2013 WL 1729365, *7 (N.D. Ind. 2013).

### 18 U.S.C §3553(a)

The Sentence imposed on the defendant should be driven by the "overarching" command of 18 U.S.C. §3553(a), which instructs district courts to "impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing."[5]. As the Court knows, the U.S. Sentencing Guidelines are merely advisory[6] and, while they generally provide the starting point for sentencing[7], a sentencing court may not presume that a within-guidelines sentence is reasonable, or that only "extraordinary circumstances... justify a sentence outside the Guidelines range." [8] In every sentencing, the court "must make an individualized assessment based on the facts presented."[9] This individualized assessment is undertaken pursuant to the long-standing principle that "the punishment should fit the

---

[4] *Id.* at 1193-1194.
[5] Kimbrough v. United States, 552 U.S. 85, 89 (2007)(quoting Gall v. United States, 552 U.S. 38, 56 (2007)).
[6] See United States v. Booker, 543 U.S. 220 (2005).
[7] Kimbrough, 552 U.S. at 109 (citation omitted).
[8] Gall v. United States, 552 U.S. 38, 47, 50 (2007).
[9] Gall, 552 U.S. at 50

offender and not merely the crime."[10] As the Supreme Court has explained, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."[11] Indeed, it is the district court that is uniquely situated to have greater familiarity with the individual defendant and individual case than the U.S. Sentencing Commission.[12]

Accordingly, after calculating the applicable guideline range, the sentencing court should then consider all of the factors set forth in 18 U.S.C. § 3553(a) to determine whether the requested sentence is "sufficient, but not greater than necessary"[13] to accomplish the goals of sentencing or whether a variance is warranted.[14] The factors to be considered under 18 U.S.C. § 3553(a) are:

1) the nature and circumstances of the offense and the history and characteristics of the defendant;
2) the need for the sentence imposed to promote the goals of sentencing including :
   a. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense
   b. to afford adequate deterrence to criminal conduct
   c. to protect the public from further crimes of the defendant
   d. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner
3) the kinds of sentences available
4) the kinds of sentence and the sentencing range established
5) The pertinent policy statements of the Sentencing Commission
6) The need to avoid unwarranted disparities; and
7) The need to provide restitution to victims.[15]

---

[10] Pepper v. United States, 562 U.S. 476, 487-88 (2011)(quoting Williams v. New York, 337. U.S. 241, 247 (1949)).
[11] Pepper, 562 U.S. at 487 (quoting Koon v. United States, 518 U.S. 81, 113 (1996)).
[12] Kimbrough, 552 U.S. at 574.
[13] 18 U.S.C. §3553(a).
[14] See Gall, 552 U.S. at 50.
[15] 18 U.S.C. §3553(a)(1)-(7).

There has been a continuing debate among the courts as to how much weight should be given to one of the listed factors, the Sentencing Guidelines.[16] The decision in <u>Hunt</u>, however, has resolved the debate for the Eleventh Circuit. In the decision, the court rejected "any across-the-board prescription regarding the appropriate deference to give the guidelines."[17] Rather, a "district court may determine, on a case-by-case basis, the weight to give the Guidelines, so long as that determination is made with referenced to the remaining section 3553(a) factors that the court must also consider in calculating the defendant's sentence."[18]. Thus, as recognized by Judge Tjoflat, in some cases the Guidelines may have littler persuasive force in light of some of the other §3553(a) factors:

> Although "judges must still consider the sentencing range contained in the Guidelines, ... that range is now nothing more than a suggestion that may or may not be persuasive ... when weighed against the numerous other considerations listed in [§3553(a) ]." <u>Id</u>. at 787 (Stevens, J., dissenting). Indeed, as one district judge has already observed,
>> the remedial majority in Booker [] direct[s] courts to consider all of the §3553(a) factors, many of which the guidelines either reject or ignore. For example, under § 3553(a)(1) a sentencing court must consider the "history and characteristics of the defendant." But under the guidelines, courts are generally forbidden to consider the defendant's age, his education and vocational skills, his mental and emotional condition, his physical condition including drug or alcohol dependence, his employment record, his family ties and responsibilities, his socio-economic status, his civic and military contributions, and his lack of guidance as a youth. The guidelines' prohibition of considering these factors cannot be squared with the § 3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant.
> <u>United States v. Ranum</u>, 353 F. Supp. 2d 984, 986 (E.D. Wis. 2005) (citations omitted). Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all but the most unusual cases are now

---

[16] <u>United States v. Hunt,</u> 459 F.3d 1180, 1182-1184 (11th Cir. 2006)
[17] <u>United States v. Hunt,</u> 459 F.3d 1180, 1184 (11th Cir. 2006)
[18] 459 F.3d at 1185

potentially relevant in every case. [19]

Courts have not excluded child pornography cases from the command of §3553 that sentences should not be longer than necessary to achieve the goals of sentencing.[20] The defendant had been convicted of downloading child pornography, something he had done for five years. The defendant was sixty-four years old, "had a history of health problems," and "had never molested a child."[21] The court approved a sentence of seventy-two months, "less than half the one hundred fifty-one months that [d]efined that bottom of the guidelines range."[22] The mitigating circumstances were seemingly far less compelling than those in Mr. Gmoser's case, but were sufficient to justify a sentence of twenty-four months rather than the fifty-seven to seventy-one months recommended by the Guidelines.[23] A twenty-four year old music student convicted of child pornography charges received a seventy month sentence rather than the one hundred and twenty-one to one hundred and fifty-one months recommended by the Sentencing Guidelines based largely on his expression of remorse, an otherwise praiseworthy life, strength of character, and the broad support of family and friends.[24]

There are, then, given Mr. Gmoser's mental illness, his limited ability to interact with society, and the nature of his offenses, compelling reasons to include him in the majority of career offender sentences that fall below the advisory guideline range. Both his "history and characteristics" and "the nature and circumstances of the offense," justify a below-guidelines

---

[19] <u>United States v. Glover</u>, 431 F.3d 744, 752-753 (11ᵗʰ Cir. 2005)
[20] See, <u>United States v. Gray</u>, 453 F.3d 1323 (11ᵗʰ Cir. 2006)
[21] 453 F.3d at 1324
[22] <u>Id.</u> at 1325
[23] See, <u>United States v. Halsema</u>, 180 Fed.Appx, 103, 104-105 (11ᵗʰ Cir. May 9, 2006)
[24] See, <u>United States v. Wachowiak</u>, 412 F. Supp. 2d 958 (E.D. Wisc. February 3, 2006)

sentence.[25]

Of the goals set out in 18 U.S.C. § 3553(a)(2), the Government and surely the Court consider carefully the need for the sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" the need "to afford adequate deterrence to criminal conduct;" the need "to protect the public from further crimes of the defendant," and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."[26] Excessively long sentences under the career offender guideline, though, do not "provide just punishment."[27] Such sentences can "offend[] the very notion of justice," and do "not promote respect for the law."[28]

In considering deterrence, Judge Presnell in <u>Williams</u> recognized that proportionality entered into the analysis: "It seems appropriate to consider the deterrence factor in light of the seriousness of the offense: the deterrent effect of a harsh sentence should be reserved for those serious crimes where society's need for protection is greatest."[29] In urging this consideration, Mr. Gmoser does not intend to minimize the nature of his offense or his criminal history. Nonetheless, both the nature of his offense and the nature of his criminal history play a role in the determination.

The need to avoid sentencing disparity is, of course, always due careful consideration. The concern, though, is with those disparities that are *unwarranted*.[30] 18 U.S.C. § 3553(a)(6)

---

[25] 18 U.S.C. § 3553(a)(1).
[26] 18 U.S.C. § 3553(a)(2)
[27] <u>United States v. Williams</u>, 481 F.Supp.2d 1298, 1304 (M.D. Fla. 2007)
[28] <u>Id.</u>
[29] <u>Id.</u> at 1304
[30] <u>United States v. Owens</u>, 464 F.3d 1252, 1256 (11th Cir. 2006)

("...the need to avoid *unwarranted* sentence disparities...")(emphasis added)[31]; "18 U.S.C. § 3553(a)(6) does not instruct district courts to avoid all differences in sentencing, only unwarranted disparities."[32] To impose the same sort of sentence on Mr. Gmoser as those who are free from mental illness, who have average intelligence, whose offense is far more serious, and whose criminal histories are either more violent or more extensive than Mr. Gmoser's is a false equality that ignores the facts. "Treating offenders who are not equally culpable the same is a false equality, not at all consistent with the admonition 'to avoid unwarranted sentence disparities among defendants with similar records who have been guilty of similar conduct."[33]

## STATEMENT OF THE DEFENDANT

I began struggling with my sexuality in the summer of 1986 when I was almost 7 years old. Several incidents during my childhood left me both embarrassed and scared about the feelings I was having. I never felt like I could go to my parents or teachers to express myself and it made me hold my feelings in. I started to notice that my feelings about my sexuality were different than everyone else causing me to have anxiety and fear because I wanted to be like everyone else. It caused me to turn inward and become reclusive for fear others would see me for who I was.

The internet became my outlet, because I could hide behind my screen, but still talk to people, some which had similar feelings to mine. People accepted me for the first time in my life and I had been desperate for human interaction. I was trying to live a normal life but

---

[31] Id.
[32] United States v. Duncan, 479 F.3d 924, 929 (7th Cir. 2007)
[33] United States v. Ennis, 468 F.Supp.2d 228, 235 (D. Mass. 2006)

couldn't figure out how to do it. But it also made me more reclusive, driving a wedge between me and my family. Once I finished high school, with the help of my Mother, I realized that I had no path.

They signed me up for college to try to take computer programming courses. It became increasingly difficult for me to understand and the workload just too great. I couldn't do the work myself and I didn't know what the ultimate goal or point of college was. The problem was solved for me when I contracted pneumonia. I had become depressed and kept asking my parents for help, but they didn't know how to help me. My father kept saying, "go to school or get a job," but those couldn't help fix the underlying cause of my inability to be myself and have meaningful, true relationship with my peers. I explained to my dad, "that won't help," so he told me to figure it out myself then. My anxiety was ever-present. My life became meaningless and pointless, stuck in a routine that I could never get out of but at least was known, understood, and helpful-even if it was just to get through to the next day. All I wanted was the love and gratification of normal human relationships, but I kept getting further and further away from it. I came to my mother every day of my adult like trying to ask for help. I could never communicate the problem to her, and it as always they didn't know how to help me, even though all of us desperately wanted this help. I became so depressed we went to the doctor and he referred me to a psychiatrist, to which I agreed. Besides prescribing antidepressants, there was nothing else he could do to help me. I agreed to see another psychiatrist. We tried the same things this time. I tried numerous other antidepressants and combinations and all they did is make me feel worse. I became increasingly more depressed and stopped seeing him, as he couldn't help me. This problem drove us further and further away from each other, as I couldn't figure out anything else to

do that would help me. I spent a few weeks with my parents during this time trying to regain my grasp on reality while waiting for admission to the Menninger Clinic in Texas. I was having delusions, paranoia, and thought impossible things were happening. I honestly thought I was responsible for the 2010 BP oil spill in the Gulf, and had some connection to the Times Square Bombing at that time. When I returned home, I became extremely anxious and couldn't function as the only life I knew, the only thing that helped me cope was taken away from me.

Please, I'm not trying to hurt anyone. I don't want to commit crimes. I want to be normal. I want a normal life. I haven't understood how to get it. I have been asking for help EVERY SINGLE DAY of my adult life, since 18 to now 43 years old. I need therapy and human contact. The porn was driving a wedge between myself and my family, the foundation for a normal life. The porn is gone and I have had 9 years to come to terms with that. All I can think of Is that I want my family back. I already lost my mom because of this problem, and I can never get that time back. All I have left is my dad, and I really want to repair that relationship before he dies; he's 78 years old. I think he needs me as much as I need him at this point, and I would really like the opportunity to correct this-to heal this wound-before it's too late. I am still asking for help. I need therapy and normal, healthy human contact to try to move with my life and my dad is willing to do that- to accept me with my flaws and do whatever it takes to provide a normal healthy life for me. Please, I'm sorry I got stuck in this situation and I can assure you I don't want to do any of this anymore. I want my life to have meaning, and that means finding something to do get better and to help other people. This will not be an overnight fix but I would like my dad to be an integral part of this healing process. He has always been there for me and tried to help me no matter what the cost. I was just trapped in

my own little world to realize it. Please let me have the rest of the time with my father before it's too late. I am still asking for help. Now I am asking you for help. Please help me. I need my father and proper mental health treatment.

Respectfully Submitted:

s/Bradley M. Kraemer
Bradley M. Kraemer (0070329)
Caparella-Kraemer & Associates, LLC
Attorney for Defendant
4841 A Rialto Road
West Chester, Ohio 45069
Telephone: (513)942-7222
Facsimile:  (513)942-6444
Email: Bradley@cklawoh.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 24, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will which will send notification of such filing to all Counsel of Record.

s/*Bradley M. Kraemer*
Bradley M. Kraemer, OH Bar No. 0070329
4841A Rialto Road
West Chester, OH 45069
Telephone: (513)942-7222
Bradley@CKLawOH.com



DEFENDANT'S EXHIBIT

 Menninger

**Patient's Name:** Jason T. Gmoser                                    **Patient's #:** 232464

## DISCHARGE SUMMARY

**DATE OF ADMISSION:**     05/27/2010

**DATE OF BIRTH:**     09/24/1979

**ADMITTING CLINICIAN:**     JAMES N. FLACK, M.D.

**DISCHARGE DATE:**     06/11/2010

**INITIAL ASSESSMENT AND DIAGNOSIS**
This is a 30-year-old Caucasian male who is a high school graduate, who is unemployed and living with his parents.

**CHIEF COMPLAINT**
"I believe I broke the world."

**HISTORY OF PRESENT ILLNESS**
Jason is a 30-year-old white male with a long history of psychiatric problems. He went without treatment for many years until approximately 2-3 weeks prior to this admission when he went to an acute inpatient psychiatric facility following the discussion he had with his mother. The patient reported that there is a 12-year-old boy that lives in their neighborhood and Jason felt that he had had a sexual encounter with this 12-year-old boy. The patient describes that he had in his mind a sexual experience following touching the boy's leg at which time the boy had an orgasm as well as his sister having an orgasm. It then went on to a more involved, delusional belief that demons were actually involved. The mother called 911 after hearing this and the police came and assessed him and took him to an acute psychiatric hospital. He required restraints at that point in time. He was hospitalized in the acute facility for 10 days. He had been given a total of 5 mg of Risperdal per day. This was gradually decreased by the patient. He eventually stopped the medicines. However, the patient continued to express feelings of having a thought disorder. He had ideas of reference and thought he was involved in a religious situation having to do with the Second Coming of Christ and in doing so he "broke the world." He felt that he was responsible for the Time Square bombing recently and the oil spill that was in the Gulf. He feels that for 20 years he has been trying to figure out what happened with him and the boy who was a neighbor of his. Denied thought intrusion or withdrawal. Denied thought broadcasting but believes that the parents were able to read his mind. He thought that he also was looking at the news and the people in the news were reading his mind and talking to him. He also endorsed suspiciousness and persecutory ideas. He felt that the animals, birds, and crows were at his house and the animals were laughing at him. There were some grandiose ideas of something especially important happening to him and having special powers. He denied auditory or olfactory hallucinations, no tactile hallucinations or somatic changes. The patient endorsed a number of symptoms of depression at the time of admission. Sometimes he thinks about suicide but he has not thought about anything or any plans in doing so to end his life. He describes some OCD symptoms such as checking the doors and locks. He describes some sort of depersonalization like symptoms as well.

**PAST PSYCHIATRIC HISTORY**
There is no psychiatric history prior to the present episode and hospitalization. During this time in the hospital he was given risperidone, trazodone, and Haldol. He was treated at Fort Hamilton Hospital for 10 days prior to this assessment.

**PSYCHOSOCIAL HISTORY**
The patient was adopted at 7 months of age. He is the only child to his adopted parents. He had some attachment problems with his father and some problems with social cognition since elementary school. He denies a history of trauma, abuse, or victimization. No history of harming animals. He describes himself as a "gay pedophile."

The Menninger Clinic

Page 2 of 4
Patient's Name: Jason T. Gmoser

Patient's #: 232464

DIAGNOSES AT ADMISSION
AXIS    I:      1.      Bipolar disorder, NOS.
                2.      Pervasive Developmental Disorder, NOS.
AXIS    II:     Deferred.
AXIS    III:    Obesity.
AXIS    IV:     Severe.
AXIS    V:      GAF of 45.

CLINICAL RESUME

The patient was initially admitted to the HOPE Unit under the care of Dr. Segundo Ibarra. He was placed on level I level of responsibilities and q.30 minutes rounds on admission. He was ordered to have a regular diet. He had a nursing assessment and psychosocial assessment upon admission. He had a dietary consult as well. Routine admission labs were ordered. His initial medications include Risperdal 0.5 mg p.o. q.4h. p.r.n. agitation. He was seen by Dr. Bettina Cardus for a medical history and physical. On May 28, 2010, the patient was transferred from the HOPE Unit to the CPAS unit secondary to his psychosis and declaration that he was a gay pedophile. Initially, he was under the care of Dr. Janet Hickey. On May 28, 2010, he was placed on one-to-one for psychosis and his Risperdal was increased to 3 mg q.h.s. and 0.5 mg q.4h. p.r.n., placed on propranolol 10 mg p.o. b.i.d. for akathisia on May 30, 2010. His trazodone, which had begun on May 28, 2010, was increased to 100 mg p.o. q.h.s. on May 31, 2010. On May 31, 2010, his one-to-one was discontinued, and he was placed on Surfak 240 mg p.o. q.d. which eventually was changed to Colace 100 mg p.o. q.d. He was continued on unit restriction at this time. On June 1, 2010, his UR was changed to level I. His Risperdal was changed to 2.5 mg p.o. q.h.s. and Seroquel 50 mg p.o. q.h.s. was added. He was ordered to have testing with Dr. Major Bradshaw, an MRI of the brain without contrast and addiction assessment. His Risperdal was tapered and his Seroquel was increased. In the absence of Dr. Janet Hickey, the patient had a diagnostic conference with his parents on June 11, 2010.

Summary of the patient's laboratories and clinical scans showed that his cytochrome P-450 2D6 was predicted to have extensive metabolizer phenotype. B12 level was 396. His hepatitis B and C were nonreactive. His HIV was nonreactive. Drug screen on admission was positive for marijuana metabolites. His lipid panel was within normal limits except for low HDL level of 32. His comprehensive metabolic profile was within normal limits. CBC was within normal limits except for mildly elevated WBC count of 13.1, MCH of 33.9, and high lymphocyte and monocyte count. His RPR was nonreactive. His EKG showed normal sinus rhythm and a normal ECG. His MRI of the brain was unremarkable.

The patient underwent neuropsychological evaluation by Dr. Major Bradshaw, Ph.D., at Baylor College of Medicine Department of Neurology. A brief summary of his neuropsychological findings dictated upon testing, performance was generally average or above. Speed of processing was somewhat variable but still generally average. His learning rate on one memory test was truly impacted by his difficult tolerating demands of testing. The breadth of the battery eventually had to be curtailed because of his worsening attitude. The validity of tasks were increasingly jeopardized. He appeared insulted by many items that were within his ability level and he was frustrated in surrendering tasks viewed as challenging. He often commented "I hate this." Stand up scores reflecting his strong intellect include superior fund of knowledge and very superior visual construction thoughts. Mood screening was indicative of mild depression. His response style on psychodiagnostic personality inventory was somewhat defensive and inconsistent. The clinical profile contained no significant elevations. Essential problem areas were listed as including portions of identity, poor control of anger, impaired empathy, drug dependence, and unhappiness. Markers for treatment motivation were very low. On additional personality inventory, the obtained profile included elevation skills associated with schizoid features. Mr. Gmoser acknowledges that somewhat his thinking may have been possibly derailed but generally still views many of his psychotic experiences/inferences as valid or as a result of "amazing coincidences." He stated that he wants to prove that his perception of thinking were right. He said that because he "helped the boy with his sexuality a weight has been lifted and he no longer has any sexual interests or preoccupation with this boy." He views all of it as behind him and believes he can move on with his life. Regarding treatment, the patient stated he was "do what he wanted and nothing else." He appeared to have very limited insight for this need for treatment given that everything was already "fixed."

The Menninger Clinic

Page 3 of 4
Patient's Name: Jason T. Gmoser                                     Patient's #: 232464

From a clinical perspective, the patient only spent approximately 24 hours on the HOPE Unit and was frequently transferred to CPAS for a smaller more contained unit. The patient was first seen by myself on May 31, 2010, on the Memorial Day holiday. He was being managed by Dr. Janet Hickey at this point in time. He was on a higher dose of Risperdal with the working diagnosis of bipolar disorder, NOS. He reported on this day that "Risperdal helped a lot." The patient was attended to by Dr. Hickey from June 1, 2010, until June 8, 2010. He gradually progressed to the point that he was on level II. On June 8, 2010, the patient was seen by myself and his social worker, Elise Judkins, LMSW, and spent one hour on the phone with the patient's mother on this day. The patient's thought processes are consistently clear and delusional content was resolved. He is being cross-tapered from Risperdal to Seroquel. He had egosyntonic sexual identity of homosexual pedophilia. He is not offended by his reports. There is no evidence that he was offended. This is a solidified identity and the patient has no ego-dystonic thoughts about changing the sexual identity. He does report that his sexual thoughts have lessened greatly since the addition of medications. He, however, was insistent that he be allowed to access his store of computer files with child pornography on them. He did a significant amount of negotiation about the future of this "stuff," which refers to his library of child pornography. His father was adamant that he would never have access to this child pornography again. We worked on a significant amount of collaborative efforts to help the patient understand that possession of child pornography was a felony and that his father would not allow him to have this in the house. On June 11, 2010, a diagnostic conference was held with myself, Elise Judkins, LMSW, the patient's parents on the phone conference, and the patient. We reviewed the data on lab, MRI and neuropsychological findings. John Oldep, MD, and David Ness, MD, sat in and contributed due to the forensic nature of this evaluation. Significant findings were for ~~positive ego~~ _syntonic_ _____ and other findings as previously dictated. The patient's psychosis has essentially resolved with medications ~~pedophili~~ at the time of the diagnostic conference. The parents were informed that if he were to get off the Seroquel the _(Answers)_ psychosis might return. He may actually act out on some either sexual or other ways if he is off his medications. We explained the clinical diagnosis as psychosis, NOS, cannabis dependence and pervasive developmental disorder, NOS, with schizoid personality disorder. We allowed time for discussion and questions. We mentioned Pine Grove Hospital in Mississippi as the potential residence of treatment center if outpatient treatment was not helpful. The patient expressed at this time that he would go back to see Dr. Samuel Robertson. I gave him several referrals for therapists who were certified sexual addiction therapists.

## PROGNOSIS AND SUPPORTING INFORMATION
Prognosis for this patient is quite guarded and questionable as he has egosyntonic homosexual pedophile as his co-identity. He was felt not to have offended at that point in time but will be a chronic risk in the future. The concern is that the father will not surrender his "stuff," which is a collection of child pornography on his computer so the patient may actually have to obtain more child pornography according to his statements. At the time of admission, the patient did not have any suicidal ideation or other destructive thoughts. His mental status exam was clear. He has full ability to follow up with treatment recommendations.

## DIAGNOSTIC ASSESSMENT AT DISCHARGE
It was previously discussed in the summary of diagnostic conference. Diagnostic assessment at discharge:

AXIS   I:        1.    Psychotic disorder, NOS.
                 2.    Pervasive developmental disorder, NOS
                 3.    Cannabis dependence.
AXIS   II:    Schizoid personality disorder.
AXIS   III:   None.
AXIS   IV:   Phase of life problems.
AXIS   V:    GAF of 40.

## RECOMMENDATIONS
The patient is to follow up with Dr. Samuel Robertson. If outpatient treatment does not work we recommend the patient be treated at Pine Grove Hospital in Mississippi.

The Menninger Clinic

Page 4 of 4
Patient's Name: Jason T. Gmoser

Patient's #: 232464

## DISCHARGE MEDICATIONS

Include Colace 100 mg p.o. b.i.d., lorazepam 0.5 mg every 4 hours p.r.n., Omega-3 fish oil 2 caps p.o. t.i.d., propranolol 10 mg p.o. t.i.d., quetiapine 300 mg p.o. q.h.s., quetiapine 50 mg p.o. q.4h. p.r.n., and trazodone 25 mg p.o. q.h.s. p.r.n. for insomnia.

_____
DICTATING M.D.: JAMES N. FLACK, M.D.

_____
ATTENDING M.D.:

8-6-10
_____
DATE SIGNED

rds/lrk/JFL08042010004
Transcribed Date:        08/05/2010
Dictated Date:           08/04/2010

The Menninger Clinic



**DEFENDANT'S EXHIBIT**
B

*A.W.A.R.E. is a state accredited therapeutic program designed to treat sexual abuse and sexual addiction.*

Dr. Stuart W. Bassman, *Psychologist-Director*

*A*ttending
*W*ith
*A*wareness
*R*ecovery and
*E*mpathy

| 21 E. McMillan St. | 1955 Mears Avenue |
| Cincinnati, OH 45219-1711 | Cincinnati, OH 45230-1980 |
| (513) 651-4365 | (513) 624-8188 |
| Fax: (513) 231-2917 | Fax: (513) 231-2917 |

www.drstuartbassman.com

The A.W.A.R.E. Program is accredited by the Ohio Department of Rehabilitation and Correction and the Adult Sex Offender Program Certifications Advisory Board to certify that participants in treatment at this office have met specified State Board basic instructive requirements as one component of their treatment program. The A.W.A.R.E. Program is also an Approved Provider of the Commonwealth of Kentucky Sex Offender Risk Assessment Advisory Board to provide Sex Offender Risk Assessment and Treatment. CONFIDENTIAL: INTENDED FOR PROFESSIONAL USE ONLY. This assessment can serve as a useful source of hypotheses about the patient. The results generated by this assessment need to be verified by other sources of clinical information and empirical data, since individual variations may not match a prototype. Further, the information contained in this report should be considered confidential and provided with a reasonable degree of psychological certitude.

## PSYCHOLOGICAL ASSESSMENT REPORT

PATIENT'S NAME: Jason Gmoser
DATE SEEN: 05/23/15
SEEN AT: DeWitt County, Illinois Jail
DATE OF BIRTH: 09/24/79
AGE: 35

TESTS UTILIZED:
Minnesota Multiphasic Personality Inventory—2
Millon Clinical Multiaxial Inventory III
Brief Symptom Inventory
Beck Depression Inventory II
Beck Anxiety Inventory
Beck Hopelessness Scale
AWARE Sexual History Questionnaire
Hare Psychopathy Checklist—Revised: Second Edition
Marlow-Crowne Social Desirability Scale

**BACKGROUND INFORMATION SOURCES:**
- Patient Interview
- Parental Interview with Mr. Michael Gmoser
- Medical records from patient's 2010 hospitalization at the Menninger Clinic
- Forensic psychological evaluation report from the Federal Medical Center, Lexington, Kentucky by Dr. Judith Campbell, Psychologist, 04/20/2015

**REFERRAL SOURCE:**
The patient was referred by his attorney, Mr. Bradley Kraemer. Mr. Kraemer is requesting a second opinion pursuant to a forensic psychological evaluation report completed by Dr. Judith Campbell on 04/20/15. It is our understanding that she is employed by the the Federal Medical Center, Lexington, Kentucky. Mr. Kraemer is wanting additional information for the Court in regard to understanding the psychological functioning of Mr. Jason Gmoser. Accordingly, with a reasonable degree of psychological certitude, this report will begin by referencing the limits of the information that will be provided, followed by a synopsis of a meeting Drs. Bassman and Park had with the patient's father, Mr. Michael Gmoser and then a psychological report that includes recommendations and treatment goals.

**LIMITATIONS OF THIS ASSESSMENTS:**

It is also important to note at the onset that there are certain intrinsic limitations within an assessment conducted in the manner in which this one was accomplished. An assessment such as the current one, which focuses on the patient's psychological needs, concerns and trial issues, is not intended to ascertain the veracity of past historical and/or factual information. Further, the patient was informed of the limits to confidentiality of this assessment and the patient acknowledged understanding such. In most instances, when one is participating in an assessment, the knowledge that the information shared will be held in strictest confidence may enable one to feel freer in self-disclosing. In this situation, the consequence of the patient's participating in an assessment, as well as his being aware of the sensitivity of the legal issues involved, may in some ways obscure and inhibit the information he presented. Therefore, the degree to which the patient's ability to be forthright and open may be affected by these factors is a matter of conjecture at this point. Secondly, the only individuals seen by this office was the patient and his father. Although some material was provided for this office to utilize, independent confirmation was not undertaken with the other individuals involved concerning any allegations.

Notwithstanding the aforementioned limitations, with a reasonable degree of psychological certitude, the following is a discussion and opinions therein of the patient's current psychological functioning and apparently at the time of the alleged offense based upon the background information provided, relevant research, tests, clinical interview that the patient participated in with this office.

PARENTAL INTERVIEW and PATIENT INTERVIEW SUMMARY:

The patient's father, Mr. Michael Gmoser, was interviewed at this office on 06/01/2015. He was asked to recount the typical behavior of his son during early childhood and latency age. Mr. Gmoser described the patient as acting almost as a "miniature adult", in that he was always serious and not interested in typical childhood activities. He read at an extremely early age, around the age of three, without receiving direct instruction. The patient began his interest in computers in first grade and quickly became extremely skilled in using computers, including programming. Mr. Gmoser remarked that one of the patient's teachers, who taught computer skills, said that the patient had advanced far beyond the teacher's own skill level. Various aspects of social and communicative development in children were discussed with Mr. Gmoser. He was asked to recall the extent to which his son may have exhibited certain behaviors as a child. The following observations by Mr. Gmoser were derived from that discussion.

Mr. Gmoser observed that Jason did not join in easily with other children. When there were family gatherings, such as at Christmas time, the patient kept to himself. He almost never approached a parent to have a conversation. He was encouraged by his parents to play sports, who signed him up for teams, but the patient did not engage with teammates and would ask to quit the teams. Jason seemed much more engaged in details than other children his age. He eschewed playing childhood pretend games and activities. For instance, at Halloween he cried about wearing a costume and did not engage with or enjoy dressing up for Trick or Treat. There was a tendency for him to do the same things over and over. He tried to be around other children, but could not engage with them in a reciprocal manner. He could not keep a two-way conversation going. The patient was wrapped up in his interest in computers to an extent that it excluded his doing any variety of childhood activity. He was naïve and gullible, taken advantage of by peers whom he gave money. There were instances of the patient's failing to understand and observe basic rules of politeness and tact. His voice and affect were always flat. Conversations were not two-way with the patient, as he spoke only of his own interests and was difficult to direct to other topics. The listener was sometimes lost because of his not explaining what he was talking about. Jason would engage in repetitive behaviors. For instance, he would sit in his room and roll a basketball around and around with his foot for an extended period of time. Mr. Gmoser described the patient as "one dimensional", because of his focus on a few interests, primarily computers, his lack of acquiring a range of social skills, and his joyless demeanor.

The impression, based on these descriptions by Mr. Gmoser, is that throughout childhood Jason failed to advance developmentally, especially in his ability to engage with and communicate with others except in the most superficial manner. Mr. Gmoser observed that the patient's mother often described these deficits as the patient's being "stuck".

Jason Gmoser                              Page 3                                   Confidential

It is intersting to note that the description, "stuck" could accurately reflect the psychological impasse that Jason unknowingly finds himself. He appears to lack the introspective ability and social comprehension to see the world through the eyes of an adult, perceiving himself as more of a child and responding to others and his environment as such. He expressed an inability to connect with peers as a child and as he moved towards his adolescent and adult years found himself unable to interact with adults at an adult level. Consequently, he identifies more with children than adults, both socially and sexually.

As a result of his extreme social underdevelopment as well as his penchant for computer knowledge he became essentially reclusive, spending much of his life on-line. Further, within his computer life, he was able to avoid any issues he has with rejection and abandonment from others, which appears to have had a profound effect on his ability to relate to and engage with others in a meaningful and productive manner. Unable to support himself because of his social and psychological deficits he has relied on his adoptive parents for most of his adult life. Further, there is evidence of impairment in his interpersonal, familial and vocational functioning.

Accordingly, he found himself unable to be employed as an adult, mostly because of an incapacity for interacting with adults in a mature manner. However, on-line, when he did not have to interact with adults face-to-face, his social reticence was lessened. Further, he reports that since early childhood he had a sexual attraction to young children, which became fixated at that level. In other words, he chronologically and physically aged but did not psychologically mature in his sexual interests, his attraction to children that began as a child remaining as he moved into adulthood.

When he encountered others on the Internet who had similar sexual interests in children he related to them as he had never related to any other adults before. In a sense, this was a new "family" and camaraderie for him that he had not experienced in his life. In a sense, he was like "Peter Pan", a being who did not grow up and lived in a fantasy world with other "lost boys". In his mind, he was not interacting with the other adults on the website as fellow adults, but in his own naiveté way, he identified with the side of them that was like himself—adults who had never moved beyond their own child-like aspects. He was not able to recognize the exploitative intent of their motives.

In fact, when I asked him about the material and financial gain from engaging in the website, he scoffed at the idea and insisted that none of them were doing this for profit. In his words, "for the first time in my life, I was able to connect with others in a way that I couldn't before. We had a common connection and it was like a family."

Jason Gmoser in his distorted thinking rationalized the engagement in the website with what he saw as a community of others like himself. Caught up in that social community—never theretofore being able to feel a connection with any other social community—he complied with suggestions by this group to join them in contributing to the efforts they were pursuing. He neither gained nor wanted any compensation from his efforts. His "payoff" was for the first time feeling a sense of belonging. Because of his immature naiveté he was drawn into this enterprise, in a sense being taken advantage of because of his computer skills and his need to feel a part of a social enterprise.

About ten years ago Mr. Gmoser had a psychotic break and was hospitalized at Menninger Clinic in Texas. He exhibited psychotic features at that time. However, to our knowledge he has not had a recurrence of these symptoms of hallucinations and bizarre mentation. At the same time, this is not to say that he is fully functional in his reality testing and ability to join the adult world in a meaningful and functional way. Instead he is seen as being largely at odds with society by virtue of his social underdevelopment, inability to empathize with child pornography victims, and absence of psychosocial resources for relating to adults. He is seen as not having ill intentions by his participation in the Internet pornography. On the contrary, because of his own desperate need for a connection without the possibility of rejection and the delusional manner in which he justifies his attitude and behaviors to himself, in combination with his mental disorders, he simply does not have a comprehension and appreciation of the extent to which such behaviors could contribute to harming children.

A relevant example is his thinking about the sexual abuse that he became aware of that his mother endured as a child and his inability to accept that she was abused. He shared in the assessment that when he became aware of what happened to his mother as a child, he began to argue with her that she was not a victim of abuse. In his distorted thinking, she consented to the sexual relationship and even though she was a child at the time, she is responsible for her decision to engage in sex. He protested, "In no way was she a victim." What is interesting is that he acknowledges his deep love for his deceased mother but he needs to strongly argue that she was not a victim.

To the extent that he is so vehemently entrenched in this "stuck" impasse, suggests that he may be afraid to truly perceive her position and the repercussions of this being that he would have to change the way he looks at "pedophilia". As Shakespeare indicated, "… protests too much". The word, pedophile originates from the Greek language and means, child lover. Apparently quite possibly, due to his emotional and cognitive disarray, he is able to rationalize and justify being a pedophile because he wants to believe that one can love a child and accordingly have a consensual and loving sexual relationship with them.

Yet, if he was able to initially therapeutically address the features of his emotional disarray that hamper his capacity to recognize the deleterious effects of pedophilic actions on children and thus become, "unstuck", he may be able to change his dogmatic stance about pedophilia.

## ADDITIONAL BACKGROUND INFORMATION and PSYCHOLOGICAL ASSESSMENT:

The following information is the examiners' recollection of what was reported by the patient in the course of the interview as well as background information submitted to this office with the patient's permission from his attorney. The patient is facing legal charges stemming from his possession of child pornography and his involvement with a child pornography Internet site.

The patient grew up with his adoptive mother and father, having been adopted at the age of seven months. His adoptive mother died from breast cancer in May of 2014; his father is still living. The patient described his relationship with his father as somewhat strained. He commented, "When I was younger a lot of the time he was a disciplinarian. I didn't understand the lengths he went to to punish me. I didn't feel a lot of affection. He was judgmental and harsh. I lost a button on my pants and he spanked me for it. They [parents] did not know how to express affection. When on vacation I enjoyed doing things with him, being out on the boat. It felt good just being included. At the beginning of high school I sort of withdrew." He described an incident he says led to his giving up trying to relate to his father. The patient was helping with yard work and hauled wood on top of the tractor, scratching the hood. His father shouted at time and the patient walked away and ignored his father. He said that this led to a rift that began his considerable distancing from his father in his adolescent years.

The patient described his relationship with his mother as "very strong". He said she was supportive and commented, "She could express love more than my father. She put me to bed and rubbed my back." The patient denied being a victim of abuse as a child. However, the patient spoke about a prior incident as a young child. He was six or seven. He was with two same age neighbor children, a boy and girl. The children decided to "play doctor".

They laid down and pretended their fingers were scalpels and did "operations" on each other. The patient stated, "It came to me that we could show each other our privates." They did show each other their privates in the course of this play. The patient stated that there was no coercion involved, but there was some mutual touching. He said that he wanted to continue this game, and was disappointed when the other children declined.

Asked about any critical incidents from childhood he recalls the patient recounted an incident he experienced as a child. He said that he had just seen the movie *Psycho* and had a fear of being in the shower, so he did not close the shower curtain. The bathroom door was open a crack and his father looked in, came in, saw water on the floor, and reprimanded him for "making a mess." The patient hid behind the shower curtain.

He commented, "He invaded my privacy. I was concerned he was spying on me. It was traumatic. Since then it was difficult for me to feel normal. I had a problem after that with people seeing me naked." He explained that subsequently he felt uncomfortable being examined by the doctor and changing for swimming.

School was difficult socially for the patient. He wanted friends, but had trouble connecting with peers. Others did not want to spend time with him. The patient concurred with a statement his father had made, that he was not very interested in school achievement, but would respond to rewards by doing well academically. The patient commented that these rewards would be things like coupons for pizzas. Jason added, "It wasn't about the pizzas. It was about being approved and feeling good about that."

The patient spoke about not fitting in with his peers. As an example he recounted an incident in elementary school when the patient's peers threw rocks at him and he retaliated in kind, but it was he who got in trouble. The only other school discipline incident he cited was when he got into trouble for making a device to make free long distance telephone calls. The patient said that he had no interest at all in making long distance calls, but made this device to try to ingratiate himself to some peers.

The patient made adequate grades and graduated from high school. He attempted college, but dropped out when he became seriously ill during his first semester.

The patient described his work history. He initially got a job repairing and working on computers at a computer store, based on his largely self-taught computer skills. He quit that job because he "got tired of it." He got another job as a cashier at a retail store, but also quit that job because he was "tired of it" and did not like the department he was assigned to. He commented that during that time he was "into marijuana" and had low motivation as a result. He would leave work, go home, and sleep. Subsequently, his parents supported him financially, but there was tension related to their doing so. He remarked, "They said I wouldn't work. I told them I could not work, because I was depressed. My father's answer was always 'Get a job or go to school.'".

The patient attributed the aforementioned depression that kept him from working as his being attracted to children but not being able to be around them. His understanding was that he had pedophilia. He found himself attracted to children but kept it a secret because he believed he did not have the capacity to explain this to his parents and hence he could not disclose what he believed to be the source of his depression. The patient stated that when he was twenty-five his mother "finally dragged that out of me [his secret pedophilic proclivity]". He added, "She said, 'come out and tell me' [the source of his distress]." The patient thought she suspected he was gay because she had used the phrase "come out". When he told her he was sexually attracted to children she became very distressed. She told him that she had been a victim of sexual abuse and tried to explain how much sexual activity with a child is harmful. He could not accept that an adult's having sexual contact with a child is harmful, because he saw it as consensual.

His mother insisted that children are incapable of giving consent and became agitated with him that he could not accept that concept. Jason became aware that his mother had been a victim of sexual abuse as a child and remembers arguing with her that she was not a victim and must have consented to the sexual interaction. Jason also noted that in his evaluation with Dr. Campbell that she also tried to convince him that children cannot give consent, just as his mother had done. He said he was irritated that Dr. Campbell did not respect his point of view. Regarding his mother, when she confronted him about his attraction to children, he remarked, "I couldn't look at her or answer her questions." He insisted that during the sex play with other children that is reported above he knew he was making his own choice, so he could not accept the notion that children are incapable of making such decisions. It is interesting to note that Jason loved his mother but **could not** see her perspective and continued to rationalize and justify his beliefs.

The patient reported that as a child he was confused about feelings of love and attachment. He thought his parents were trying to show him affection, but did not know how, and he never felt really loved. When he was six or seven the only expression of love he related to was what he saw in cartoons. The patient explained, "The characters would look at the other characters they fell in love with and their eyes would pop out and their tongues would hang out." He had a crush on a same age girl at school and tried to show his affection by acting like those cartoon characters. He was reprimanded by his teacher for acting that way and put in time out. The patient still resents the teacher for not understanding that he simply could not express his feelings any other way.

The patient stated that his attraction to boys began early in life, around the same time as the playing doctor incident described above. He started to have sexual thoughts about boys the same age as he when he was eleven or so. He never got beyond an attraction to boys that age, even when he became an adult.

The patient reported an incident with the prepubescent son of his drug dealer that led to the patient's having a psychotic break that resulted in his hospitalization at the Menninger Clinic in 2010. When he first met this child the child was six years old, and the patient described an instant attraction to the child, and he interpreted as "love at first sight". In 2010, when the child was twelve years old, the patient was with the boy and rubbed his foot on the boy's leg. The patient believes that action caused the boy to have an orgasm. Asked why he had such a belief he replied, "He started smiling. I had my eyes closed, but in my mind I could see that he had an orgasm. I felt I could feel it, almost like I had one." He sees that event as the beginning of his psychotic break. The patient stated that prior to his having the psychotic break he had child pornography and told his therapist, Dr. Robertson, about it. Because his therapist did not report it, he assumed that he could disclose it at Menninger and it would be confidential. However, evaluators at Menninger told his parents about the pornography who insisted that he not possess it anymore. He felt that he needed the pornography and conflicted with his parents over that issue. He commented, "I resented being denied it. I saw nothing wrong with having it." After leaving Menninger he ceased taking his medications and had "terrible anxiety" during that period.

Jason Grnoser                                    Page 8                                    Confidential

He said that the only thing that would curb his anxiety at that time was driving, because when he was driving he had something to focus on. He felt agitated and had to be doing something all the time. The patient stated that he finally "got over" this anxiety. After the psychotic break he stopped using marijuana, tried it one more time, then ceased using it altogether. He continued to view child pornography.

The patient spoke of how much he felt "unlike others" because of his attraction to children during the period after his hospitalization. He had a sense of being unable to feel loved or express loving feelings and believed his parents "...couldn't express love and caring in a way that was at the depth I needed." He isolated himself more and more and spent almost all his time on the computer.

The patient recounted the history of his child pornography use. He said that when he first started using child pornography it was very hard to get. He had taken some college courses and ran an on-line bulletin board at his college. In the process he found out how "news groups" work. Surfing some news groups he found some child pornography. It was difficult to access, because he was using dial-up access, but he was able to get some of this material. He got his own Internet account and started browsing news groups for more material. This practice lasted until 2000 when the material became much harder to find. Someone had posted a guide to something called "Tor", which was software for getting onto what is called the "dark net" or "onion net." Users on the dark net can run servers anonymously and whoever is accessing the material can be anonymous. The site he became involved with that led to his arrest was called "Love Zone" as was on the dark net. He had found the address to that site on a "hidden wiki" and "just went there". He discovered that to go to the Love Zone one needed to post fifty megabytes of material. He explained, "Once you have access you can access others' posts. You have to post at least once a month. I went there just looking for material."

The patient continued, "It took a long time, but they noticed I was posting a lot of Russian material. There were no errors. I was helpful in solving problems. So they suggested I be a moderator. That was where you would approve or deny their posts." He was asked to clarify what being a moderator was and replied, "If the links and things worked, if previews matched the materials I would approve it." He said he made sure there was no sadistic material and deleted it if he found any. He explained that there were several levels of users with different names. Being a moderator or co-administrator was just a name for the level rather than necessarily indicating whether or not a user was instigating or operating the site, per se. He said that his involvement was all voluntary and there was no money involved. He did not see himself as running the site, just a part of a group that kept this voluntary site going. He commented, "For the first time in my life I had a group that I could be useful to—like a family. It made me happy because I was accepted—appreciated. Being able to talk to people about how I felt I no longer felt isolated. I could communicate about my attraction to children and not be rejected."

Other than his involvement with Love Zone the patient played games on-line with others. He played with people at all ages, but enjoyed playing with certain children. He met a young game-player who was ten years old on-line and played a zombie game with him. The patient described the boy as "nice, smart, funny". He did not know how the boy's parents might react if they learned he was interacting with the patient, the patient being an adult. However, he went to Missouri to play the zombie game with him at his home. He talked to the child's father who accepted his being there. The father joined in and played the game, too. On the first trip to see the boy, according to the patient "nothing happened". The patient had been feeling very depressed, but with this child he felt "normal for the first time in a long time. He said that his feelings were not sexual at first. He felt emotionally on the same level as the child, doing things that kids do" with him. He remarked, "Part of me is still growing up." The patient rubbed the child's back because the patient had loved having his back rubbed as a child, and it turned sexual. The patient indicated that he had not had sexual contact with any other children except for the sex play incident with other children as a six year old.

Throughout the Clinical Interview the patient was very detailed and pedantic in his discussion. He made little eye contact and was difficult to redirect when he spent an excessive amount of time bogged down in irrelevant details. When he was asked to set aside the irrelevant details and condense his account to the basics he would say something to the effect of "I was getting to that" and resume his highly detailed account. This pattern was especially evident when he was talking about computer technology.

The patient described his life at the time he was heavily involved with the child pornography. He said that he would get up, log onto his computer, and stay on all day, doing essentially nothing else but meet his basic needs. He was asked how it feels to be incarcerated and out of that pattern and responded, "I don't want to be without the child porn. I'm hornier now than I ever was. As long as I have something to look at and deal with my urges and depression I feel better." He was asked if he used fantasy as a replacement for pornography and replied, "Fantasy without porn is not enough. It's not real. Fantasy and masturbation with porn deals with my depression. I like seeing people happy, so watching children enjoy themselves make me happy, because I missed out on that when I was a child. It [attraction to children] started when I had thoughts about other boys [same age] at 11 or 12 in seventh and eighth grade."

Dr. Campbell's report had remarked about the patient's interactions with other inmates when he was at Lexington going through his evaluation, saying that he interacted appropriately and socialized. Since the patient had spoken about his sense of social alienation earlier in the current interview he was asked about Dr. Campbell's comment. He responded, "I didn't feel accepted [by the other inmates]. I could hang out, but it was always superficial. Playing cards or something. I only connected at that level." He began to talk about his feelings when with other adults and said, "I don't relate to adults. Grown-ups think they know everything. I enjoy helping children learn and be guided." He stated that he does not feel a part of the adult world and added, "I can have conversations with adults on science, computers, math, but not at a personal level. I can't get deep into discussions.

I can't express myself well. I don't know how to respond when they ask me if I have a girlfriend." He explained that he feels self-conscious about his life of not being like others. Since the patient was on the computer all the time, he was asked if he could relate to other adults on social media. He responded, "I'm not into social media, because I can't relate to adults. On Love Zone they felt the same way as me, so I could converse with them, because they understood."

The issue of the patient's sexual urges regarding children was further explored. He stated, "Sex is the bottom of the list of what I want to do. Higher on the list is normal relationship stuff with people I can relate to on a normal level. I have a problem relating to adults because I can't understand why they have the interests they do. For example, the news and certain TV shows, going to work at jobs they don't like. I listen to adults converse and I can't connect with it. With children I can relate. A lot of it is they're not set in their ways. They're accepting—open-minded. I hear adults talk about their relationships with other adults and what they do and gossip and I can't relate to it."

Because of his contention that he cannot socially connect with other adults the patient was asked if he has any adult friends. He replied, "I had certain friends when I was younger, but I don't know how to measure something like that. I don't have any close friends as an adult. I would like adult friends. I found myself unable to. The only ones I had a decent relationship with were the ones I played video games with." He said he does not have any adults he feels he can confide in.

The patient's socialization in childhood was explored. He said that as a child he lived in the country, where there were not many children around. There were some other children he associated with, but he believes he was "used" by them because he had video games they wanted to play. Peers excluded him when he tried to make friends. He indicated that he simply did not know how to make friends. He saw peers having friends and felt excluded. He would invite children over to his house and then be baffled about what to do with them.

Some lists of symptoms regarding possible social underdevelopment, social withdrawal, and unusual thoughts and behaviors were used to prompt some interview questions. The patient responded to these items first by endorsing written statements and then answering some follow-up interview questions. These items were presented for stimulus value only, not in the form of instruments that were intended to be scored. The patient discussed the following typical behaviors. He indicated that he prefers to do things the same way over and over again. He prefers to do things alone versus with others. He has strong interests and gets upset if he cannot pursue them. The patient has trouble making new friends. He is mostly quiet with others and reported that he has trouble expressing himself verbally, especially with other adults. The patient indicated that he rarely laughs or smiles. He said that he has no one he confides in outside his family.

The patient was asked about sensory and possible repetitive behavioral issues in childhood and at present. He indicated that there are "certain things that bother me." The texture of objects with fine ridges are annoying to him. Certain high-pitched sounds annoy him, and he feels anxious at the sounds of people raising their voices or arguing. He said he has been described as sloppy, but this perception is because he has to have his possessions out where he can see everything at once. Everything had to be laid out in view. He had a stopwatch as a child and used it to time things. In particular, he would time his father's flights (his father flew a private plane) and would keep careful track of the flight times. He checks door locks repeatedly and counts events, such as the number of times he washes under his arms when showering and the number of times he scrubs his head when washing his hair.

As a child the patient had an interest in crafts. He engaged in crafts that involved intricate, repetitive operations, such as sewing, latch hook, and cross-stitch. He noted that these pursuits are traditionally feminine, but he never had any interest in being the opposite gender or felt as if he was a female. He started learning about computers as a young child of six or seven, learning to program in BASIC when he was in first grade. His father described him as a "savant" with computers. Later in life, child pornography, according to the patient, became "all-consuming".

BEHAVIORAL IMPRESSIONS AND MENTAL STATUS:

The patient presented himself as initially quite reserved and reticent. The nature of the non-confidentiality of the assessment was described to him, and he signed release of information forms without hesitation. The patient read the registration papers very meticulously. He spoke of wanting a "second opinion" for the previous forensic evaluation by Dr. Campbell. His initial disclosures were terse and parsimonious. Later in the interview, he was wordier, but almost exclusively about technical computer matters and accounts of his on-line activity. He was initially expressionless and made no eye contact. When the interview proceeded to issues he seemed to relate to more fully there was some limited eye contact and a little less flat affect. His manner of speech tended towards a monotone and there were almost no instances of his offering a smile, and when he did smile it was only a faint one.

The patient was overweight, had very short dark hair, and wore glasses. He wore correctional center garb and appeared adequately groomed. He was handcuffed throughout the session, the handcuffs attached close to his body with a waist chain. He called an attendant with a request to loosen the cuffs, complaining of tightness and wrist pain. The correctional officer explained that here were no smaller cuffs available and that the cuffs he was wearing could not be further loosened because of his large wrists. Throughout the interview he appeared frustrated and annoyed with the sensation of the cuffs and the difficulty of his doing writing tasks that were part of the assessment with them on. However, when asked if the cuffs interfered with his responding in writing to the assessment tasks he indicated that they did not, only that they were uncomfortable. He periodically showed his frustration with the cuffs by fidgeting and sighing deeply.

The patient described his health as good. The only medication he reported taking currently is Bactrin (antibiotic) for cysts. He had a serious bout with pneumonia in 1997, when he had just begun college. This was a life-threatening condition. After he recovered he stopped taking college courses. In 2010 the patient apparently had a psychotic break and was hospitalized at Fort Hamilton Hospital in Hamilton Ohio, and then at Menninger Clinic in Texas. At Menninger he was prescribed a number of antipsychotic medications, including Risperdal, Seroquel, and Trazadone. He reported that after his discharge from Menninger he ceased all psychotropic medications.

Prior to his hospitalization at Menninger the patient had received treatment from several mental health providers. His recollections of those providers was rather spotty, and his reliability as a historian in this regard appeared somewhat limited. Finally, he indicated that he has seen a psychiatrist, Dr. Ed Hackett, then a psychiatrist named Dr. Sam Robertson, and finally a therapist named Dr. Miller, who appears to have been a psychologist. With regard to these treatment providers he indicated that he believes he never received much help from any of them. He commented, "I never felt close to any psychiatrist." Asked to say how he may have been helped he replied, "They didn't say much to help. Just that the pills would help. I talked to them, but they never had an answer." He was questioned with regard to why he believed the therapy was not helpful and replied, "I would tell the first therapist [whom he saw prior to his hospitalization] that how I felt was represented in movies and he should rent the movies to know my feelings." He does not believe his therapists watched any of the movies in an attempt to understand him. The patient indicated that he thought he needed to use the movies to explain himself because he has problems expressing his thoughts and the movies communicate what he wanted to say. Initially, prior to his hospitalization at Menninger the patient was prescribed anti-depressants such as Paxil, Wellbutrin, and Lexapro.

Background information from Menninger Clinic described his status at the time of his initial hospitalization and gave a discharge summary. He described an encounter with a twelve year old boy that involved his touching the boy's leg which he believed caused the boy to have an orgasm. He expressed a belief that demons were somehow involved, and he spoke of believing he had "broken the world" and was responsible for a terrorist attack and a major oil spill. The patient thought that animals were talking to him and people were reading his mind. His psychosis was described as having been resolved with medication and he was referred back to his psychiatrist, Dr. Samuel Robertson. During a family consultation the patient appears to have had a dispute with his parents about his possession of child pornography, the patient insisting that he needed to retain it, and his father insisting that he get rid of it.

With respect to chemical use the patient reported that he used alcohol on occasion, but did not use it excessively. He described a high tolerance to alcohol. He began to use marijuana in 1998 or 1999, which would have been at the age of 19 or 20. He stated that his quantity of use of cannabis was two joints a day. He tried several other substances at the age of 18 or so. He used cocaine twice, but did not like it. He used psychedelic mushrooms twice and LSD twice.

He tried the LSD because he had heard about the interesting hallucinations that substance was purported to cause, but did not have the hallucinations he expected. The patient spoke of a sense of euphoria from that substance and seeing a few visual patterns. Then he "crashed" emotionally and did not take LSD again. With regard to the cannabis he remarked, "Marijuana numbed me and lowered my depression". He reported having used cannabis for a number of years, but reported ceasing its use after his discharge from Menninger. Apparently, he tried using it once more after attempting to cease its use, then stopped using it altogether. He remarked about cannabis, "All it did was take away my confidence and memory."

Asked to describe himself the patient initially replied, "I don't know." After some reflection he replied that he sees himself as "very nice, caring, thoughtful, and a good listener." With regard to being a "good listener" he commented, "I'm a listener. I have a hard time talking." He expressed positive self-regard. Asked what he might change about himself the patient replied, "I'm not happy with myself. I wish I hadn't passed up on opportunities." He did not elaborate about what he believes he missed out on.

Attention and concentration were adequate during the session. Although the patient has taken many risks with very serious consequences and has made choices that inhibited his social and occupational development he does not acknowledge that his judgment is problematic. Intelligence is estimated to be in the superior range. Memory seems grossly intact; though the patient spoke of not recalling "some daily things I don't care about." There were not any incidents of florid psychotic process during the session, though the patient has a history of a psychotic break in the past.

Also, his thinking process suggests a significant difficulty in assessing and appreciating social situations which is seen as a departure from the degree of perception of social reality necessary for adaptive social functioning. He denied hallucinations with the exception of seeing some visual patterns when he took hallucinogens. He had some delusions and ideas of reference during his psychotic break in 2010 and spoke of at that time seeing something undefined in the corner of his eye that "felt like a presence." With respect to the psychotic break he commented, "I don't know what it was like. I had been depressed." The patient denied violent thoughts, plans, or behaviors. He added, "A few times I was agitated and argued with my parents, kicked a hole in the wall, threw a phone two times, when I was angry." He said that when he gets angry, "I generally don't do anything." He spoke of doing things to distract himself from his anger.

The patient insisted that he never considered suicide. He remarked, "I never could [commit suicide]. There are things in my life I want." Asked what he wants, for example, he replied that he wants to "experience love on some level" adding "I haven't yet." He denied current suicidal plans or intentions.

Affect was flat; mood appeared somewhat depressed. Initially the patient stated that his typical mood is "neutral". Then, on reflection, he stated that he feels depressed, because "there is something missing in my life.

Jason Gmoser                              Page 14                              Confidential

I'm just very sad." The patient also described anhedonia, saying that he does not enjoy life very much and that "things seem pointless". He remarked that all the activities he does feel like "filler"—just something to do instead of what he really wants. He went on to say that what he really wants is to be with a friend, adding that such a friend would have to be a child, since he cannot relate to adults. Asked about anxiety symptoms the patient reported that he is "not a worrier". He expressed some degree of concern about his current legal plight, but expressed a rather fatalistic attitude about what might happen to him.

TEST RESULTS:

One of the limitations in providing an assessment for planning usage is the extent to which a patient's responses are affected by the knowledge that information accrued is a component of a decision that will be rendered. When someone participates in an assessment without a third party reviewing the results, it would seem more likely for an individual to be less guarded and careful. The extent to which the particular mode of responsiveness and self-expression found in this assessment is natural and usual for the patient is difficult to ascertain because of the aforementioned planning component of this assessment. Nevertheless, an adequate amount of information was provided that would suggest that this assessment could enable the examiners to offer an opinion regarding disposition and recommendations. With a reasonable degree of psychological certitude, the following discussion and opinions therein of the patient's psychological functioning are based upon the tests, background information provided, and clinical interview that the patient participated in with this office.

The patient responded to the Brief Symptom Inventory (BSI). This instrument allows a patient to self-report symptoms in the categories of: somaticization, obsessive-compulsive features, interpersonal sensitivity, depression, anxiety, hostility, phobias, paranoid thinking, and psychoticism. None of these scales were significantly elevated.

The patient completed the Beck Depression Inventory II (BDI II). This instrument is designed to ascertain the extent to which clinical depression may be present. The patient's score on the BDI II was in the range designated as typical of the "ups and downs" most normal persons experience. The patient responded to the Beck Anxiety Inventory (BAI). His level of anxiety symptomatology, according to this instrument is considered minimal. The Beck Hopelessness Scale (BHS) is used, because hopelessness is an important symptom of depression, and because hopelessness is correlated with suicidal risk. The patient's score on the BHS was minimal, suggesting little ideation associated with feelings of hopelessness.

The Marlowe-Crowne Social Desirability Scale (MCSDS) was administered. This scale is designed to ascertain the extent to which respondents are likely to present themselves in an overly positive or socially acceptable light. The results from this scale can have implications interpreting an individual's level of self-disclosure. The MCSDS has two factors represented by two different subscales (Attribution and Denial); there is research to suggest that these two scales are valid for using the instrument with sex offenders.

The Attribution scale tends to be elevated when respondents exaggerate their status and abilities, their emotional stability, or their egotistical tendencies. Among sex offenders high scorers on this scale are those who are attempting to impress others or make a positive impression in the course of an evaluation. The patient scored at the 50th percentile on this scale. The implication is that he is not likely to have intentionally presented himself in an overly positive light in the current evaluation.

The second subscale of the MCSDS, Denial, tends to be elevated among sex offender respondents who have a tendency to deceive themselves by denying socially disapproved behaviors. They are inclined to make excuses for their behaviors and present themselves as less responsible for their behaviors. The patient scored at the 99th percentile on this subscale, suggesting a very high tendency towards self-deception and rationalization. Thus, overall, the patient is seen as likely to have presented himself in a manner that was not directly intended to make an overly positive impression, but his self-presentation may have also been colored by rationalization and self-deception. His tendency to be self-deceptive has implications for future treatment, in that his cognitive distortions (thinking errors) with regard to his sex offenses will be an important focus of treatment.

The patient responded to the Minnesota Multiphasic Personality Inventory—2 (MMPI—2). This instrument has limited usefulness for the current assessment because of the patient's tendency to present himself in an unrealistically positive light as he responded. However, despite the fact that this response style curtailed the validity of the test results, per se, the presence of that response style can be revealing of certain personality characteristics. Specifically, this elevation suggests naiveté, lack of psychological mindedness, rigid thinking, and unrealistic self-image, and neurotic defensiveness.

The patient completed the Millon Clinical Multiaxial Inventory III (MCMI III). The high social desirability evident on the MMPI—2 and MCSDS was not present in this administration of the MCMI III, the patient appearing to present himself as not overly virtuous or socially favorable. There was some tendency for him to possibly hold back in presenting psychological distress, but that tendency is corrected to some extent by the scoring system, and was not so pronounced as to invalidate the results. The patient's profile was consistent with individuals often described as appearing to be involved in their own world of preoccupations rather than reciprocal social activity. They are passively detached from others and unresponsive to all forms of stimulation. Feelings of anger, depression, and anxiety are rarely expressed. They have a preference for remaining socially detached. They have little, if any, interest in having sexual experiences with other persons. They seem indifferent to praise or criticism.

The patient responded to the AWARE Sexual History Questionnaire (ASHQ). The ASHQ contains the paraphilias listed in the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DMS IV—TR)*. Additionally, there are other questions regarding sexual behaviors that may be problematic, but not indicative of paraphilias, per se.

This questionnaire was developed at this office merely to identify possible interview questions to use in probing the extent to which paraphilias might be present. On this questionnaire the patient did not endorse items indicative of paraphilias, such as exhibitionism, voyeurism, frotteurism, fetishism, or sadomasochism. He acknowledged a sexual attraction to prepubescent children and compulsively viewing pornographic images of children.

The Hare Psychopathy Checklist—Revised (PCL—R) was completed for the patient as a means of estimating the degree of psychopathy or antisocial tendencies which might be present. According to this scoring of the PCL—R alone, the patient does not have significant signs of psychopathy or antisocial personality. However, on one facet of the PCL—R the patient scored above average. That was the facet regarding affective features, such as low empathy and shallow affect.

In instances that involve sexual acting out, we would normally employ an "actuarial" instrument, such as the Static-99R, to get some sense of a patient's proclivity to re-offend. An actuarial instrument indicates recidivism risk level categories to which an individual may belong, based on historical data. However, when a child pornography offense does not involve the actual presence of the offender with a child victim the Static-99R rules indicate this instrument is not appropriate, so it was not used in this case. In the absence of actuarial assessment we must rely on clinical judgment to assess risk. Because of the patient's pronounced social and psychological underdevelopment and impaired capacity to grasp the harmful consequences to children, he is insistent on using child pornography and his firmly stated belief that there is nothing wrong with having sex with children or viewing child pornography.

SUMMARY OF CLINICAL IMPRESSIONS:

In summary, the patient appeared to be fully oriented during the session. He reports having a psychotic break about ten years ago, which involved a number of delusions. During the current interview there were no clearly overt symptoms of psychotic process that might be present in a florid psychotic episode. However, his thinking process suggests a significant difficulty in assessing and appreciating social situations which is seen as a departure from the degree of perception of social reality necessary for adaptive social functioning. He appears to have well above average intelligence. Although test results do not present a great deal of depressive symptomatology the patient subjectively describes deep feelings of sadness and a history of longstanding depressive symptoms. He seems to take a rather fatalistic stance with regard to his current plight, denying a significant degree of worry or anxiety.

The patient reports a history from childhood of awkwardness in attempts to form social connections. He has always wanted to make friends but found himself unable to muster the social resources to do so. The impression is that his social development has remained at the level of latency childhood. The patient discusses adults in the same manner as one would expect a preadolescent child to do so, baffled by the pursuits, interests, and thinking process of adults.

The patient described some unusual sensory and repetitive behavioral experiences, including finding the texture of objects with fine ridges annoying, being distressed by certain high-pitched sounds and feeling anxious at raised voices. He reported a history of keeping close track of details and some obsessive-compulsive-like repetitive behaviors.

The patient recalls developing a sexual attraction to same age male children when he was a young child, retaining that attraction and never advancing developmentally to have an attraction to same age persons as an adult. He retreated into a reclusive stance as an adult, finding himself unable to meet the social demands and tedium of the work world, and relying on his parents for financial support. He spent his entire days using marijuana to self-medicate his depression and using the computer, mostly to view child pornography.

The patient became engaged in an Internet site that made child pornography available to its users. He described a hierarchy of user-members of this organization, which he believed to be all-volunteer and non-profit. Out of what appears to be a very high degree of naivete he was impressed and apparently taken in by praise from higher-ups in this organization, who enlisted him to help them, without pay, to screen potential posts. The patient has always felt like an outcast throughout his life, unable to make social connections, seeing himself as completely different from others because of his attraction to children. However, when he engaged with this on-line community of child pornography users he felt for the first time in his life socially included. He commented, "For the first time in my life I had a group that I could be useful to—like a family. It made me happy because I was accepted—appreciated. Being able to talk to people about how I felt, I no longer felt isolated. I could communicate about my attraction to children and not be rejected." He is seen as having been used by those who ran this site, much in the same way he spoke of being used as a child by peers who only wanted to play his video games.

THERAPEUTIC IMPLICATIONS AND RECOMMENDATIONS:

In spite of the severe consequences he is facing as a result of his child pornography use, the patient continues to insist that he sees nothing wrong with viewing that material, or with an adult's having sexual contact with children. He sees adults' having sex with children as a way to make the children happy, and denies that young children do not have the capacity to give consent to such interactions. He appears to have no insight into the notion that children are psychologically harmed by sexual contact with an adult, in spite of his mother's having conveyed her own experience in this regard and others explaining to him the rationale of the illegality of sexual abuse of children.

**The impression is that someone who is so much at odds with societal expectations and so oblivious to the reality of the cultural context in which he exists has a severe impairment of a capacity to truly appreciate and conform to these societal expectations.**

In the patient's case this impairment is seen as having been present from very early in his life and significantly affected his social development and perceptions throughout his developmental cycle into adulthood. We concur with the diagnosis of pervasive developmental disorder, not otherwise specified, (PPD NOS) and originally offered when the patient was evaluated at the Menninger Clinic. The designation "not otherwise specified" indicates either that not all the criteria were met or that the diagnosis is being made later in life, beyond the time in the developmental cycle when it is typically diagnosed. It was included in the diagnostic manual in use at the time of the patient's Menninger hospitalization, the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM IV). Dr. Campbell, in her report, questions the diagnosis of pervasive developmental disorder, because it is typically made in childhood. She used the diagnosis of schizoid personality disorder instead. It is true that the diagnosis is typically made in childhood, but that is not to say that it cannot be established retrospectively when the symptoms come to light in adulthood.

Menninger Clinic gave a diagnosis of both schizoid personality disorder and pervasive developmental disorder. These two disorders have a great deal of symptomatic overlap, but our impression is that the patient's symptomatology conforms more to pervasive developmental disorder than schizoid personality.

Before continuing this diagnostic discussion it is important to clarify some points. Pervasive developmental disorder was a category contained in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM IV—TR). This edition of the DSM has been superseded by the new DSM edition, the DSM-V. In that edition pervasive developmental disorder is replaced by autism spectrum disorder. Our impression is that the patient's symptoms are more in line with the symptomatology of a developmental disorder than they are with schizoid personality disorder. The following discussion clarifies the rationale for the current diagnosis.

First, with regard to schizoid personality disorder, the criteria in the DSM-V are that the patient does not enjoy or desire close relationships; almost always chooses solitary activity; has little or no interest in sexual activity; takes pleasure in few if any activities; lacks close friends; appears indifferent to praise or criticism; shows emotional coldness, detachment or flattened activity. The patient does, in fact, very much desire close relationships; he simply has not had the resources to access them. He does choose solitary activities, but not because of a wish to avoid social contact. Rather, he has not been able to connect socially in an adaptive manner. He does has a strong interest in sexual activity. He does take pleasure in some activities, although limited in scope.

His father reported that he responded well to rewards as a child, and the patient spoke of feeling good about the acceptance rewards provided. Further, he responded in an extremely distressed manner to criticism by his parents. He does have an appearance of emotional coldness and detachment, though when interviewed he expressed a strong wish for attachment and some strong emotional experiences that do not show on the surface. While superficially he fits several of these criteria, the DSM specifies that these criteria should not be accounted for by other conditions, including autism spectrum disorder. The patient is seen as having more symptomatology included in the mild end of the autism spectrum than consistent with a schizoid personality disorder.

It should be noted that few individuals fit precisely into any diagnostic category. However, our impression is that the patient's diagnostic status would best be represented by the original diagnosis provided at Menninger Clinic, i.e. pervasive developmental disorder, NOS (PDD, NOS). That diagnosis recognized the presence of a number of symptoms of pervasive developmental disorder that likely account for his severe social underdevelopment as an adult. A complication is that the new edition of the DSM subsumed PDD, NOS under autism spectrum disorder, creating confusion when attempting to translate PDD, NOS to the new classification scheme. Our conclusion is that in order to retain conceptually the PDD, NOS diagnosis it could only fit under the autism spectrum disorder category in the DSM V. Setting aside diagnostic labels, which can be confusing and misleading in some circumstances, it appears that the patient does, in fact have a number of symptoms that are present among individuals who have pervasive developmental problems. These symptoms include persistent deficits in social communication and social interaction, deficits in social reciprocity, and poor skills for developing and understanding relationships. There is also a history of very restricted patterns of interests and activities, along with some fixated interest of unusual intensity and hypersensitivity to sensory aspects of the environment.

Further, the patient's developmental difficulties are not seen as merely a result of deficits in social learning or lack of opportunity to learn to socialize or appreciate societal demands. Rather these deficits are seen as a result of a fundamental inability to acquire, internalize, and consolidate the resources necessary to develop an understanding, appreciation, and application of social growth and development. In the absence of this capacity the patient remained arrested at earlier stages of social development, fixating on cognitions and feelings that were part of his childhood experience, including a sexual and emotional attraction to children. Because of that lack of development his sense of self coalesced at an immature level, such that he essentially took on the identity of a child, seeing himself as alienated from the adult world and only able to connect with children, emotionally and sexually as well. From that stance he could not imagine a child being any different from his perception of himself in terms of having the capacity to make rational decisions about how to act sexually.

Empathy is a capacity that appears fully fairly late in the developmental cycle, so that it appears the patient never acquired a mature sense of empathy from which perspective he could appreciate how sexual abuse can be frightening or humiliating to a child.

Jason Gmoser                              Page 20                              Confidential

He egocentrically defined a child's experience of sexual contact as he, himself believed he would experience it, a source of pleasure and affection. These deficits have greatly impaired the patient's capacity to understand, appreciate, and act upon the sense of moral or societal transgression regarding sexual offenses against children present in rational and mature individuals. His perceptions depart so substantially from that of a reasonable and rational person living in our culture that they are seen as inconsistent with a clear and cogent sense of reality and appreciation of the wrongfulness of that conduct.

Treatment for the patient would need to be very intensive obtained by possibly civil commitment instead of a punitive commitment. He would need preparation that addresses his distorted social perceptions before he would be amenable to a traditional sex offender program. If he cannot accept that sex with children is wrong, he would likely not engage with such a program. Instead, therapeutic efforts to help him explore the nature of his social underdevelopment and acquire resources for compensating with the dynamics that underlie it would be essential. It would be hoped that in individual psychotherapy he could be helped to form a close relationship with another adult, something that has heretofore eluded him. Also, group psychotherapy with other adults to provide opportunities to learn to engage socially at a more mature level would be advised. Such efforts are likely to require a long term of treatment and would focus on his gaining adaptive behavior to function in the adult world and acquire means to compensate for his condition rather than attempts at personality reconstruction.

David Finkelhor, a nationally and internationally respected sociologist, has studied child sexual abuse for decades. He noted that "Arrests make great publicity. But it is only through a multidisciplinary, comprehensive mobilization of dedicated child welfare, social service, mental health, drug rehabilitation, [and] educational systems — working together with law enforcement — that we will find a solution..."

William D. Park, Ed.D.
Assistant

Stuart V. Bassman, Ed.D.
Supervising Psychologist
Ohio License #3495
Kentucky License #536

**The A.W.A.R.E. Program is accredited by the Ohio Department of Rehabilitation and Correction and the Adult Sex Offender Program Certifications Advisory Board to certify that participants in treatment at this office have met specified State Board basic instructive requirements as one component of their treatment program. The A.W.A.R.E. Program is also an Approved Provider of the Commonwealth of Kentucky Sex Offender Risk Assessment Advisory Board to provide Sex Offender Risk Assessment and Treatment.**

CONFIDENTIAL

July 9, 2015

Mr. Bradley Kraemer
Attorney at Law
4841A Rialto Road
West Chester, Ohio 45069

Dear Mr. Kraemer:

RE: Addendum to Psychological Assessment of Jason Gmoser

Pursuant to your request and with a reasonable degree of psychological certitude, the purpose of this addendum is to clarify the content and conclusions of the psychological assessment report for Jason Gmoser in relation to the U.S. Code regarding the insanity defense. Accordingly, the following is a brief discussion and opinions therein of Jason Gmoser's psychological functioning at this time and apparently at the time of the alleged offense based upon the assessment that he participated in with this examiner.

The conclusion is that the patient clearly has a severe mental disease and defect. Specifically, he has a pervasive developmental disorder that has impaired his social development to an extent that he has been and remains unable to function in the adult world psychologically, occupationally, emotionally, or socially.

Further, not only does he suffer from that debilitating condition, but that severe mental defect has made him unable to appreciate the nature and quality of the wrongfulness of adults engaging in sexual acts with children or using pornography portraying such

behavior. Although Mr. Gmoser is able to cooperate with his attorney regarding his legal defense and recognizes the consequences of being found guilty of violating the law, he is unable to appreciate the nature and quality of the wrongfulness of his acts.

If I can be of any further assistance, please do not hesitate to contact me.

Sincerely,


Stuart W. Bassman, Ed. D.
Psychologist - Director
Ohio License #3495
Kentucky License #536


DEFENDANT'S EXHIBIT C

1   each of these areas.  So it goes from very, very severe,

2   completely dysfunctional, where you have to be in

3   full-time residential care, to quite mild, or much less

4   severe, where you can live independently or

5   semi-independently.

6        Q    Now, based on your review, your training and

7   experience, in the event Jason Gmoser were to have been

8   diagnosed on the autism spectrum, how would you apply

9   these sorts of factors to him based on what you know?

10       A    Well, I think clearly he has fluent language.

11  He has social skills that are reasonably good because

12  he's able to engage in these transactions with a variety

13  of individuals.  And his IQ testing says he's in the

14  above average level of intellectual functioning.  And

15  aside from what might be called the restrictive and

16  repetitive behaviors, he otherwise -- his ASD symptoms

17  are relatively mild, if they exist at all.  So we would

18  see him -- if he had the diagnosis, which I don't think

19  he does, he would be in the very high end of the

20  spectrum.

21       Q    High end, meaning mild impairment?

22       A    Mild impairment, right, so a mild level of

23  severity.

24       Q    All right.  We can bring Government's 33 down.

25  Actually, why don't we keep it up there for now.

USA v. JASON GMOSER, Case No. 14-20048 -- Jury Trial (02/12/16)    54

1    regarding the severity of any diagnosis of ASD that might

2    be returned regarding Jason Gmoser?

3         A    So if, in fact, he did have a diagnosis of ASD,

4    it would be very mild.  It would not be terribly severe.

5              MR. BECKER:  No further questions, Your Honor.

6              THE COURT:  Mr. Kraemer, would you like a

7    break, or you want to start right away?

8              MR. KRAEMER:  No, sir, we're ready.

9              THE COURT:  Okay.  Oh, did you -- I just got

10   signaled.  Did you move to admit 34, or do you move to

11   admit?

12             MR. BECKER:  We'll move to admit Government's

13   Exhibit's 34, yes, Your Honor.

14             THE COURT:  Any objection, Mr. Kraemer?

15             MR. KRAEMER:  Which one was 34?

16             THE COURT:  34 was the PowerPoint we all saw.

17             MR. KRAEMER:  No objection.

18             THE COURT:  34 is admitted.  It's a

19   demonstrative exhibit.

20             MR. KRAEMER:  May I proceed, Your Honor?

21             THE COURT:  You may.

22               CROSS-EXAMINATION BY MR. KRAEMER:

23        Q    Dr. Leventhal, are you familiar with the term

24   "Monday morning quarterback"?

25        A    I'm familiar with it.

1      Q      Okay.  You offered a series of opinions here on

2   someone that you have never met, correct?

3      A      Correct.

4      Q      You've never performed any kind of clinical

5   interview or any kind of diagnostic process with Jason

6   Gmoser, correct?

7      A      No, sir.  I've not.

8      Q      Okay.  Is that typically how a doctor would

9   treat a patient?

10     A      I'm not treating him.

11     Q      Okay.  Is that typically how a doctor would

12   come to a diagnosis of a patient?

13     A      It's not uncommon for me to review records and

14   to make diagnostic assumptions, either before I see them

15   or to assist a colleague in their evaluation and

16   treatment of a patient.

17     Q      Okay.  But making a diagnostic opinion or

18   making an assumption is different than you making a

19   diagnosis of someone yourself, correct?

20     A      I'm not sure I understand the distinction

21   you're making.

22     Q      Okay.  You're not making a diagnosis here, are

23   you?

24     A      I'm not making a diagno-- I'm, I'm -- I

25   think -- I'm reasonably confident that based on the

USA v. JASON GMOSER, Case No. 14-20048 – Jury Trial (02/12/16)     56

1   information that I have that the diagnos-- the absence of

2   a diagnosis of ASD is correct.

3       Q    Okay.  Well, let's come about this from a

4   different way.

5       A    Sure.

6       Q    It was your testimony that everyone that has

7   autism has basically their own individual profile,

8   correct?

9       A    That would be correct.

10      Q    And, in a sense, everyone that has autism,

11  their autism is different?

12      A    Just like each of us is different.  Who we are

13  is, affects how disease manifests itself, or symptoms --

14  syndromes manifest themselves.

15      Q    Okay.  And I believe it was your testimony --

16  and I don't want to know how old you are.  But it's my

17  understanding --

18      A    Happy to tell you.

19      Q    I don't need to know, sir.

20           It's my understanding that diagnoses of autism

21  have gone on for many a year?

22      A    Yes, sir.

23      Q    Okay.  Close to a hundred?

24      A    No.  Since 1943.

25      Q    Okay.  So 60 years, roughly?

DEFENDANT EXHIBIT
tabbies



2180 W. State Rd. 434, Suite 1106          Robert E. Cohen, PsyD, ABPP
Longwood, FL 32779                         Robyn J. Cohen, Ph.D.
Ph:(407) 920-8321 Fax: (407) 790-4357      www.neurocognitiveconsultants.com

Date: 03/29/18

Attention: Brad Kraemer, Esq.
RE: Jason Gmoser Psychological Evaluation Summary Report

Dear Attorney Kraemer,

The following is a brief summary letter describing my psychological evaluation findings regarding your client Mr. Jason Gmoser (DOB: 9/24/79). I will be providing a more detailed report in the upcoming months. Mr. Gmoser was seen at Boone County jail, Burlington Kentucky on 11/3/17 to evaluate his psychological functioning in the context of his charges regarding downloading child pornography and a well-documented chronic history of psychiatric dysfunction. Mr. Gmoser was engaged in a clinical interview as well as several psychological test measures including the AAA (AQ, EQ, and RQ), the SRS – 2 (self and other report), subtests from the WAIS-IV, tests of constructional praxis, a structured inventory of malingered symptoms, Adaptive behavioral scales, and the MMPI-2 – RF.

Prior to evaluating Mr. Gmoser, I discussed the case with defense counsel, interviewed Mr. Gmoser's father, and reviewed all available documents. Of particular note and importance was the specific review of the following documents: A neuropsychological evaluation by Dr. Major Bradshaw in 2010 during Mr. Gmoser's first inpatient psychiatric hospitalization. He was admitted for symptoms of psychosis, excessive compulsive symptoms of looking at child pornography, marijuana abuse, and compromised functioning. Dr. Bradshaw indicated that Mr. Gmoser was experiencing *excessive the delusional beliefs related to sexual thoughts involving a minor*. A psychiatric discharge summary written by psychiatrist Dr. James Flack, revealed his diagnostic impressions of Mr. Gmoser as *psychotic disorder not otherwise specified, psychotic disorder due to a medical condition with hallucinations, and pervasive developmental disorder not otherwise specified*. Comprehensive forensic psychology evaluation conducted 4/20/15 and 3/20/17 by Dr. Betsy Judith, whose ultimate opinion was that Mr. Gmoser had a diagnosis of *a pedophilic disorder, schizoid personality disorder and cannabis use disorder in a controlled environment*. In May 2015, Dr. Stuart Bassman, a forensic psychologist performed a comprehensive psychological evaluation on Mr. Gmoser with his diagnostic impression of pervasive developmental disorder not otherwise specified (PDD NOS), with the conclusion that Mr. Gmoser, *"clearly has a severe mental disease and defect. Specifically, he has a pervasive developmental disorder that has impacted his social development to an extent that he has been and remains unable to function in the adult world psychologically, occupationally, emotionally, or socially"*. It was the opinion of Dr. Bassman that Mr. Gmoser has, *"A severe mental defect that is made him unable to appreciate the nature and quality of the wrongfulness of adults engaging in sexual acts with children or using pornography for training such*

*behavior. Although Mr. Gmoser is able to cooperate with an attorney regarding his legal defense recognizes the consequences of being found guilty of violating the law, he is unable to appreciate the nature and quality of the wrongfulness of his acts."* I have reviewed the transcript of Dr. Bennett Leventhal from 2016, a psychiatrist who was not convinced that the client had a pervasive developmental disorder but stated, *"one could seriously argue that he has a highly fixated interest in pornography and particularly pediatric pornography. He did acknowledge that if the client had a diagnosis (of PDD), he would be at the very high end of the autism spectrum".* Although several experts have differed regarding the specific diagnostic category of Mr. Gmoser, the overall impression was that Mr. Gmoser is suffering from a significant psychopathological difficulty which has symptoms of impaired social skills, obsessive rumination, and psychotic thoughts.

CURRENT EVALUATION: Mr. Gmoser was seen at 9:30 in the morning and was fairly cooperative in a clinical interview with this examiner. He presented as a large man with flat affect who provided intermittent eye contact. His tone of voice was monotone. His gait was unsteady and antalgic due to a spinal injury. He mentioned that he had neurogenic bowel and bladder and was wearing protective undergarments. Mr. Gmoser did not have difficulty discussing his past and revealed relative lack of interest in discussing anything other than his restricted range of interests. He seemed both confused and excited to talk about the details of a relationship that appeared to primarily exist in his head. The content of the discussion was primarily delusional in nature and involved a great deal of Mr. Gmoser saying what he thought other people are thinking. He discussed delusions of reference and fearful paranoid thoughts. This included making a special interpretation of seeing a cat on his porch, a paper bag, and intuiting some type of meaning about a young boy. It is of note that he was not on any medication at the time of this evaluation. During the interview, Mr. Gmoser provided many unnecessary details, was tangential discussing books he wished others to read, and had an unusual with flights of ideas. Mr. Gmoser stated that after the strange and bizarre events this signaled, *"the beginning of the end"*. He refers to these events as premonitions provided an example of how he and his friend's car crash. Upon discussing the nature of his charges of child pornography, Mr. Gmoser does not feel that what he did was wrong. He is able to partially acknowledge that other people think he is wrong but he is unable to integrate this information, see or understand others' perspectives, and could not tolerate discussion about the reason for its wrongfulness. Mr. Gmoser continued to perseverate on several aspects of child pornography and his wish that the judge would see his desires and provide him access to children. He indicated that he felt as though he was a child trapped in a large man's body. In fact, Mr. Gmoser's emotional maturity and emotional intelligence is of a much younger person. He felt that his relationship with Christian, an 11-year-old, was on an "even" level. Although he discusses the potential for physicality between them, this has a delusional and fantastical nature and there is no evidence suggesting that he ever touched Christian. He discussed his odd desire and thoughts of wanting to be a father and to have a son. At no point did he ever indicate or acknowledged that there was a power differential between them or that he would engage in nonconsensual sex with anyone.

In consideration of the DSM-5 criteria, Mr. Gmoser revealed ample evidence of a diagnosis of Asperger's syndrome. He revealed intermittent eye contact, flat affect, monotone voice, and little body language. His father reported that he never asks about how others are doing and only wants to talk about issues pertaining to himself. He had no sharing of other interests as a child with other children or with adults. His father described him as gullible and that he would, "*believe anything people told him*". He has had very few friends over the years and those that he talked to were far younger than him. Those that were his age would reportedly come to his house and use Mr. Gmoser to set up their computers. He describes during the interview, his friends Gabriel and Will, who were far younger than him. Mr. Gmoser could not understand basic social niceties or customs. For example, he could not understand why his friends were mad at him when he was invited to a funeral and came dressed in casual clothing and flip-flops. Mr. Gmoser stated, "*why would I buy a suit just for a funeral*?" There is evidence that Mr. Gmoser had sensitivities to specific sensations. For example, he cannot wear flip-flops because the insert between the two front toes would bother him. Another aspect of his repetitive and restricted behavior was his discussion on the, "powers of two". Referring to the environment, in which Mr. Gmoser found patterns of pairs of items that bothered him. Mr. Gmoser became upset when anyone changed his routine at any time. He was scared by loud noises and could not tolerate cold temperatures. His father stated that he wore the same jacket for nearly 20 years as well as a baseball. He prefers to only wear tie-dye shirts. During the interview, Mr. Gmoser repeatedly used similar catchphrases such as "*there's nothing to do about it*", "*why can't people let me be me*" and "*you just don't understand*".

There are other indicators of his autism spectrum including being precocious as a child in using technical words. His father stated he was talking and reading at age 3. As a young child at age 6 or seven, he began obsessively taking apart computers and saving parts. Mr. Gmoser acknowledged that he has very little feeling toward other people. His father validated this and stated that he never reacted with compassion or empathy when either he or his wife were crying or seemed upset. When a bit older, he analyzed stocks and wrote code, all technical interests that did not involve socializing with others. Mr. Gmoser stated that, "*relationships are pointless if I'm not learning or getting something out of it.... I don't see the purpose of having one.*" Mr. Gmoser was often very rigid and concrete and followed rules and often pointed out violations. He stated, "*it bothers me when others don't follow the rules*". He likes the science in the science fiction does not like the fictional material. The relative questionnaire from the AAA (RQ), Mr. Gmoser's father, Michael reported on his son's symptoms as a child. He indicated a score of 30/31. 87% of children with autism spectrum score a 15 or more. His empathy quotient (EQ) score of 19/80 was also indicative of autism spectrum with 80% of autism spectrum patients scoring a 30 or less. His autism spectrum quotient score (AQ) of 37/50 was also suggestive of an autism spectrum diagnosis with 80% of autism spectrum patients scoring a 32 or more.

SUMMARY: After reviewing the clinical history and evaluating Mr. Gmoser, it is the opinion of this examiner that Mr. Gmoser's severely concrete reasoning, intense restricted range of interest, firmly held delusional thoughts, and inability to take on

JG                                                                                                           3

other's perspectives, greatly restrict or block his ability to integrate information presented to him. It is these mental defects, that restrict Mr. Gmoser in being able to aid in his own defense or work with counsel in a meaningful manner. This is not an issue of limited intellect (he is scoring in the high average to superior range as per previous testing), rather it is Mr. Gmoser's inability to utilize and integrate his knowledge into making good decisions or seeing others' perspectives. His psychotic perseverative thoughts also render him incapacitated to filter out reality from fantasy. Mr. Gmoser meets the clinical criteria for Autism Spectrum Disorder (formerly known as Pervasive Developmental Disorder) and a separate co-morbid psychotic disorder, NOS. He was already inpatient hospitalized in 2010 for 3 months following a psychotic break in which he espoused the same thoughts and ruminations and was given similar diagnoses. Mr. Gmoser would greatly benefit from the use of an atypical antipsychotic medication (Seroquel and Risperdal) as he did when he was inpatient hospitalized in 2010.

The above summary and opinion provided above were based on all available records and discussion with the client and his family. If additional information is provided, I am happy to integrate these findings into my clinical impression/opinion if appropriate. Please let me know if I can be of assistance in any other aspect of this case.

Diagnosis:
1) Autism Spectrum Disorder (ASD)
2) Psychotic Disorder, NOS, with a severely restricted range of interest, fixed delusional thinking, and rigidity of thought.
3) Per History, polysubstance abuse in total remission

Most Respectfully,

Robert E. Cohen, PsyD, ABPP
Clinical Neuropsychology
Diplomate in Rehabilitation Psychology
American Board of Professional Psychology
FL Lic#PY7151

JG                                                                                          4